In assessing transfer inheritance tax in respect of the estate of Richard H. Williams, the Comptroller included among the assets of decedent's estate (upon which the tax was computed) an item of $194,912.47 as a part of decedent's interest in the partnership of Williams Peters. Appellant contends that this item was not a part of decedent's taxable assets. Whether or not the Comptroller erred in so including it, is the sole question at issue in this appeal. No question is raised as to the method of arriving at the valuation of the item, or the accuracy of the computation of such value.
Decedent at the time of his death (April 28th, 1923) was a member of the partnership aforesaid — which had earlier consisted of four members, to wit, Richard H. Williams (the decedent), Samuel T. Peters, Richard H. Williams, Jr., and Harry T. Peters. Samuel T. Peters had died in 1921, and thereupon a new partnership agreement was entered into on *Page 119 
November 4th, 1921, under which the estate of the said Samuel T. Peters was continued as a partner together with the three surviving partners. This was to continue until January 1st, 1925. The capital account of the partnership belonged equally to Richard H. Williams and the Samuel T. Peters estate, and this was not to be withdrawn during the period. Salaries of $30,000 each for the two younger men and of $60,000 for Richard H. Williams were provided. Profits (and losses) were to be shared in the proportions of 15% each by the junior partners and 35% each by Richard H. Williams and the estate of Samuel T. Peters. It was specifically provided that if any partner should die before the termination date — January 1st, 1925 — the business should continue to be carried on by the remaining partners and the estate of the partner so dying should be continued in the business until that date.
This was the partnership agreement in force at the time Richard H. Williams died, April 28th, 1923. (It was modified after his death, but that of course is of no materiality on this inquiry — the value of his interest is to be determined as of the date of his death.)
Under it, as will be observed, Richard H. Williams had an interest of 50% in the partnership capital, and 35% in the profits, which continued, notwithstanding his death, until January 1st, 1925. (His salary of course terminated at his death.)
The Comptroller, in computing the value of his interest in the partnership, included his 50% interest in the capital account, his interest in several special accounts, and the item, now in dispute, of $194,912.47 — which was the sum fixed by the Comptroller as the value, or rather as part of the value — as of the date of decedent's death — of the decedent's interest or right to continue to share in the profits of the firm until January 1st, 1925.
The business of the firm was the selling of coal for certain large coal companies, under agency contracts, for which sales it received percentage commissions. Some of these agency contracts (called the Western contracts) were to expire and *Page 120 
did expire about six months after decedent's death — but in that time the firm collected commissions of $310,457 for sales made under them. The other contracts which were also to expire in November, 1923, were assigned to the United States Distributing Co. on March 27th, 1923 (a month before decedent's death), under an agreement whereby the latter company was to pay to the firm a flat sum of $125,000 per year for five years and also a commission of 1 1/2% on all coal sold up until the termination of the agency contracts in November, or until the end of an extension of such contracts, if the coal companies agreed to extend them. The firm of Williams and Peters, in addition to assigning the contracts and their good will (exclusive of the firm name) were to use their efforts to secure an extension of the contracts from November, 1923, to April, 1924, and a renewal contract of five years thereafter — and if such extension and renewal was not obtained, the agreement was to be void. The extension and the renewal were obtained however, after Richard Williams' death, and the United States Distributing Co. paid to the Williams Peters firm the $625,000 and also the 1 1/2% commission on sales up to April, 1924, which amounted to $361,939.47.
By reason of delays in the administration of the estate the actual assessment of the transfer inheritance tax was not made by the Comptroller until some years after decedent's death, so that at the time of such assessment the figures of the actual income and expenses of the firm were available and were used by the Comptroller in ascertaining the profits of the firm, instead of any theoretical method such as must necessarily have been used had that ascertainment been determined at or shortly after decedent's death.
He made a separate appraisal of decedent's interest in the $625,000 payments, commuting that sum to a valuation as of the date of decedent's death. Appellants have not appealed from, or raised objection to, the inclusion of that item in the taxable estate.
He made another appraisal of decedent's interest in the commissions received by the firm during the year subsequent to decedent's death for sales under the "Western contracts," *Page 121 
($310,457 as hereinbefore stated) and under the contract with the United States Distributing Co. ($361,939.47 as hereinbefore stated) — deducting from this total the partnership operating expenses of $87,659 for the entire period, which left $584,737 as net profits, of which decedent was entitled to 35%, or $204,658. Discounting the sum at 5% he arrived at the figure of $194,912 as the value of decedent's interest in these profits as of the date of his death. (The firm did business for only a year after decedent's death, and hence made no further profits.)
Appellants' argument against the inclusion of this item as a part of decedent's taxable estate seems to be based chiefly upon the theory that the question involved is whether or not the partnership had any actual asset of good-will at the date of decedent's death. It is not perceived however that any such question is involved. Defendant's argument may be accepted as sound — indeed it appears to be entirely sound — that the commissions received by the firm during the year following decedent's death, and also the $625,000, were income of the firm. (The $625,000 became an account receivable — a credit asset — of the firm during that year, although the time for the actual payment thereof by the debtor was spread over five years.) Such income however, to the extent of the amount that it exceeded the expenses of the firm, constituted the firm's profit. Under the provisions of the partnership agreement in effect at decedent's death (as has heretofore been noted) decedent's interest (35%) in the firm's profits continued until January 1st, 1925 — which was more than a year after his death.
At decedent's death, therefore, his interest in the firm (disregarding his special accounts on the firm's books) was his 50% share of the firm's capital account plus the value — commuted or discounted as of the date of his death — of his 35% share in the firm's profits for the next year and a half to come. That is precisely what the Comptroller has included in the taxable assets.
Of course the value of his interest in the future profits was not known at the date of his death. There might have been *Page 122 
little or no profits, or even a loss. But the facts of the profits actually made, show what the actual value of that interest was. Evidence of the profits actually made is obviously the best kind of evidence toward ascertaining the actual value of such an interest; although there may be other facts which must be considered and allowances made therefor in arriving at the actual value — such for instance as the fact that part of the apparent profit may consist of enhanced value of capital assets, or the like.
On the day before decedent's death, if it could then have been known what the actual profits of the next year and a half would be, a prospective purchaser of his interest in the firm would have paid approximately the value of decedent's capital interest plus the discounted value of his interest in the profits. Of course no such knowledge was or could be available at that time, and any one endeavoring to fix the value then would have had to estimate it on the basis of such knowledge and information as was available (including the knowledge of past profits and future probabilities), and such estimate might have been higher or lower than the actual value as ascertained by subsequent actualities.
All this however is beside the issue on the appeal — for as has been said there is no question raised as to the accuracy or method of computing the value: the only issue is as to whether the Comptroller erred in including, in the taxable assets of the estate, decedent's interest in the future profits. It seems entirely clear that his action in so doing was not error; and that the tax must be affirmed, with costs.
One consideration occurs, which may be mentioned — although it may in fact have been duly considered and acted upon in the Comptroller's computations: it is not apparent from the record whether it was or was not, and the question is not involved in the appeal. In view of the fact that decedent's capital interest was to remain in the firm until January 1st, 1925, the amount of that capital interest was not available for use until then — or at least (as the event proved) until a year after his death. It would seem that some allowance should be made in respect of that deferred availability. To *Page 123 
illustrate: a bond of $1,000, upon which the principal plus six per cent. interest would be payable in one year from now, would be worth now approximately $1,000, but a capital interest of $1,000 in a firm, which would be payable in one year from now plus 35% profit, would have a present value of $1,000 plus the discounted value of $290 ($350 less $60 for the ordinary interest on the principal). So in the case sub judice it would seem that in determining decedent's interest in the firm, a deduction of 5 or 6% of his interest in the capital account should be made, either from that capital interest itself (in the valuation of that capital interest), or from the amount of his interest in the profits (in the valuation of that interest in the profits). *Page 124